Filed 7/16/14  P. v. Galvan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065488 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1101502) |
| JOSE ALBERTO GALVAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed.

Victoria H. Stafford, by appointment of the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jose Alberto Galvan of committing three sex offenses against the then-16-year-old female victim in February 2011:  (1) forcible penetration with a foreign

object (count 1:  Pen. Code,[1] § 289, subd. (a)(1)), (2) forcible oral copulation (count 2: § 288a, subd. (c)(2)), and (3) forcible rape (count 3:  § 261, subd. (a)(2)).

As to each of these three counts, the jury found to be true allegations that in committing each crime, Galvan (1) entered a residence with the intent to commit a violent sex offense (§ 667.61, subds. (c), (d)(4)); (2) committed the crime during the commission of a burglary (§ 667.61, subd. (e)(2)), and (3) kidnapped the victim (§ 667.61, subd. (e)(l)).

The jury also convicted Galvan of preventing or dissuading a witness from testifying (count 4:  § 136.1, subd. (c)(l).)

The court sentenced Galvan to a state prison term of 75 years to life, consisting of three consecutive terms of 25 years to life for his convictions of counts 1 through 3, plus a concurrent determinate term of three years for his count 4 conviction.

Galvan appeals, contending (1) his three sex-offense convictions (counts 1-3) and the jury's true findings on the related enhancement allegations should be reversed because (a) the prosecutor committed misconduct during her rebuttal argument to the jury by "trivializing" the beyond-a-reasonable-doubt standard of proof, and (b) his trial counsel rendered prejudicially ineffective assistance by failing to object to the prosecutor's misconduct; (2) the consecutive sentences imposed for his convictions of counts 1 through 3 should be reversed and the matter should be remanded for resentencing because the court applied section 654 instead of section 667.6, subdivision (d) (hereafter

---

[1]     All further statutory references will be to the Penal Code.

section 667.6(d)) in deciding whether to impose concurrent or consecutive terms for those three sex-offense convictions; and (3) if this court concludes the court applied the correct standard in imposing consecutive sentences for his convictions of counts 1 through 3, the consecutive sentences imposed in counts 1 and count 2 under section 667.6(d) nevertheless should be reversed because there is insufficient evidence to support a finding he had a "reasonable opportunity to reflect" between the forcible oral copulation of the victim (count 2) and the forcible penetration of her vagina with a foreign object (count 1) within the meaning of section 667.6(d). We affirm the judgment.

FACTUAL BACKGROUND

A. *The People's Case*

In February 2011 the victim lived in Riverside County with her sister and her sister's two children. Galvan met the victim when she was about 14 years old, and he was dating her cousin.

On February 11, 2011, after school, the victim was alone at home babysitting her sister's children while her sister, whose shift ended at 1:00 a.m., was at work. At around 8:00 p.m., the victim heard some knocking at the front door while she was watching TV with the children. She opened the door and the exterior motion light went on, but no one was there.

About 10 to 15 minutes later, the victim again heard knocking at the front door, but this time she did not open the door. Instead, she looked through the window and saw the motion light was on, but again no one was outside.

3

About an hour later, at around 9:15 or 9:30 p.m., the victim again heard knocking at the front door.  She looked out through the window and saw that the motion light had not turned on, and once again she did not see anyone outside.  Shortly thereafter the victim locked the doors, turned off all the lights, and then retired with the children to her sister's bedroom, where they went to sleep.

The victim testified that right after she and the children went to bed she heard more knocking at the front door, but this time she ignored it.  Shortly thereafter someone approached her in the bedroom as she was lying on her side with her eyes closed.  He touched her shoulder and placed his hand over her mouth, pressing down to cover her mouth.  The victim yelled and could only see the man's eyes because most of his face was covered with a drawstring-type hooded sweatshirt.

The victim testified that the man whispered to her in Spanish that he wanted to take her to her room.  She started screaming when he picked her up and started to carry her there.  She tried to turn on the light by the door of her sister's room, but was unable to do so.  The man pulled her away, picked her up, and dragged her to her room.  As he was dragging her, the victim asked him who he was and told him to stop and leave.

After the man took the victim into her bedroom, he closed and locked the door.  The victim testified he then began touching her as she stood in the room, and he told her to let him touch her.  Invoking God, the victim asked him to let her go and leave, but he did not answer.  The man told her that if she would let him touch her, he would not do anything to her.  He touched her breast over her clothes, and she tried to push him away.

4

The victim then tried to go to the door.  The man threatened her by telling her he had a knife and would kill her and the children if she screamed or did anything.  The victim testified she began to recognize Galvan's voice by his accent when he said her name.

Galvan stopped touching the victim's breast when he told her to lie down on her bed and take off her clothes.  When she failed to comply, he took her to her bed either by carrying her or pulling her.  The victim fought back and bit Galvan's hand when he tried to take off her T-shirt.  He told her to stop and threatened again that if she screamed or did anything he would kill her and the children.

Galvan pushed the victim down on her bed with his hands and told her he knew her and liked her and wanted to have sex with her.  He then touched her breasts and licked her breast and neck while she tried to push him away.  Galvan again threatened her, but she kept trying to resist him.

Galvan pulled down his shorts, put the victim's hand on his penis, and tried to have her masturbate him.  The victim testified she did not resist because he kept threatening her, and he forced her to touch him this way more than once.

The victim testified that Galvan took off her pants and underwear, started licking her "private part" between her legs and then started touching her there with his fingers. He penetrated her with his fingers, hurting her.  The victim kept trying to push him away. She continued to try to push his head away as he was licking her vagina and penetrating her with his fingers.  The victim told Galvan to leave and take her laptop, her camera, and her money.

5

The victim testified that Galvan then told her, "Okay, then I'm just going to do it." He then put his penis in her vagina, hurting her, as she was trying to push him off of her. However, he was unable to fully penetrate her. In a laughing manner, he asked whether she was a virgin, and she said, "Yes." Galvan got up off the bed, touched himself, and ejaculated on the victim's leg.

Galvan pulled up his shorts and told the victim that if she told anyone about what had happened he would kill her family. He then left.

The victim testified she stayed in her room, crying, for about 10 minutes. She then turned on the lights in her room, noticed a mess in the area where she kept her jewelry, and found her three gold bracelets were missing. About $50 in cash was also missing.

The victim went to check on her sisters' children, who were still sleeping, and when she found the front door was unlocked, she locked it. In the living room she found the DVD's were in disarray and some movies were missing. The victim sat down in her sister's room and waited for her sister to return.

The victim testified she was still scared and crying when her sister returned home from work. The victim reported to her sister that Galvan had raped her and had threatened to kill her and the children with a knife if she said anything. Her sister called the police.

Bethany Thrasher, a forensic registered nurse at the Riverside County Regional Medical Center, indicated that the victim arrived there at about 4:00 o'clock the next morning. Thrasher testified that the victim seemed "a little anxious, tearful, but quiet." Thrasher conducted a pelvic examination and saw that that the victim had abrasions,

6

bruises, and lacerations.  The victim also had abrasions on her upper lip and nose area and an abrasion on her cheek.

Thrasher collected a swab of a dried secretion on the victim's right inner thigh. Forensic testing revealed sperm cells on the thigh swab.  DNA testing established that the sperm was an "identical match" to Galvan's reference sample.

The victim's sister testified that she returned home at around 1:45 a.m. on the night of the incident.  The victim was crying and shaking when the victim told her Galvan had raped her.  The victim told her sister she was unable to defend herself because Galvan threatened to kill the children.

The victim's sister also testified the money she had left in her wallet on the dining room table—about $80—was gone.  She discovered the loss the next day, when she needed to buy milk.

The victim's sister also testified that Galvan's mother, his girlfriend (who is the victim's cousin), and his girlfriend's mother and sister came to her house to try to pressure the victim into changing her story about what had happened.  At trial, the victim confirmed that her cousin and Galvan's mother tried to pressure her to change her story.

Galvan's girlfriend testified that Galvan arrived home around 11:30 p.m. on the night of the crimes.  He told her he had been in Los Angeles.  The next day, as Galvan and his girlfriend were dancing, he asked her to hug him and said he had made a mistake and he never wanted to be in jail.

During a search of Galvan's trailer, police recovered the victim's gold bracelets and the missing DVD's.

7

B. *Defense Case*

Galvan did not testify at his trial, and the defense rested without presenting evidence.

DISCUSSION

I. *PROSECUTORIAL MISCONDUCT/INEFFECTIVE ASSISTANCE OF COUNSEL*

Galvan first contends his three sex-offense convictions and the jury's true findings on the related enhancement allegations should be reversed because (1) the prosecutor committed misconduct during her rebuttal argument to the jury by "trivializing" the beyond-a-reasonable-doubt standard of proof, and (2) his trial counsel rendered prejudicially ineffective assistance by failing to object to the prosecutor's misconduct. We conclude these contentions are unavailing because (1) Galvan forfeited his claim of prosecutorial misconduct; (2) he has not substantiated his claim of misconduct because he has not shown, and cannot demonstrate, the claimed misconduct rendered his trial unfair or that the prosecutor used deceptive or reprehensible methods to persuade the jury; (3) he was not prejudiced by the claimed misconduct; and (4) any ineffectiveness by his trial counsel was similarly harmless.

A. *Background*

1. *CALCRIM No. 220* (*reasonable doubt*)

The court properly instructed the jury under CALCRIM No. 220, which defines reasonable doubt, informs the jury it must consider all the evidence and instructs the jury the defendant is entitled to an acquittal unless the evidence proves him guilty beyond a reasonable doubt. As pertinent here, the court instructed the jury under CALCRIM No.

8

that "[p]roof beyond a reasonable doubt is proof that leaves you with an *abiding conviction* that the charge is true."  (Italics added.)

2. *Closing arguments*

During her closing argument, as pertinent here, the prosecutor referred to the jury's duty to apply the law, reminded the jury that the court had already instructed them on the law, and stated that "if for some reason you remember hearing the law differently from his Honor, *always go back to the jury instructions* that you will have in the back.  Same thing with defense counsel.  If he says something that kind of misinterprets the law, always go back to the packet."  (Italics added.)

In his closing argument, defense counsel spoke about the nature of an "abiding conviction" as it relates to the beyond-a-reasonable-doubt standard of proof:

> "The instruction, the law is proof beyond a reasonable doubt is an abiding conviction to the charge as the truth. *What is abiding conviction?  It is a long-lasting long-held belief, one that is essentially not easily changed. It's steady. It's steadfast. So it is an opinion. It is a belief that is not going to waiver in a couple hours or possibly a day or week or two or possibly more.*  An example of what an abiding conviction might be.  Each one of you has their [*sic*] *own* example.  Perhaps it is your religious beliefs, that abiding conviction you have in those beliefs is not going to change tomorrow.  It is not going to change next week.  It is not going to change next month.  It's an abiding conviction.  Perhaps some of you it is your relationship you have with your significant other that in your mind in your dedication that abiding conviction will remain today, tomorrow, the next day.  Perhaps if you have children your abiding conviction of the children is not going to change tomorrow or the next day.  It's going to be steadfast, something you believe in, something you feel comfortable with."  (Italics added.)

9

In rebuttal, the prosecutor addressed that argument:

"[P]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction the charge is true. That's your definition. *There's nothing about you can't wake up in a week and change your mind or that it has to be concerned about how you view your relationships or your children.* There's none of that. That's not in the definition. You get to decide what is beyond a reasonable doubt. *That's your choice.* That's what you decide based off the evidence that's been provided here. I just wanted to direct you back to the law and what the law actually says." (Italics added.)

B. *Analysis*

Galvan's claim of ineffective assistance of counsel is premised on his contention that the prosecutor committed misconduct during her rebuttal argument to the jury. Specifically, relying principally on this court's decision in *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*), Galvan asserts the prosecutor incorrectly defined "abiding conviction" as that term is used in CALCRIM No. 220 to define proof beyond a reasonable doubt,[2] and thereby "trivialized and diluted" the reasonable doubt standard, by arguing that an "abiding conviction" is a short-term decision that need not last even a week and is not comparable to the conviction with which one makes decisions about family matters, and that the jury could choose what is beyond a reasonable doubt. Galvan also asserts his trial counsel was ineffective in failing to object to the prosecutor's misconduct because the jurors "would have assumed from defense counsel's silence . . . that [an] abiding conviction as used in CALCRIM [No.] 220 [meant] that the jurors' conviction need not last through the week and need not be particularly deeply felt,

---

2     As noted, CALCRIM No. 220 states in part: "Proof beyond a reasonable doubt is proof that leaves you with an *abiding conviction* that the charge is true." (Italics added.)

10

and that 'reasonable doubt' was a subjective standard of the jury's choosing." These assertions are unavailing.

As already noted, defense counsel stated during his closing argument that an abiding conviction is a "long-lasting long-held belief" that is "not easily changed," it is "steady" and "steadfast," and it "is not going to waiver in a couple hours or possibly a day or week or two or possibly more." To illustrate what constitutes an abiding conviction, counsel argued that "[p]erhaps it is your religious beliefs" or "your relationship . . . with your significant other" or children.

Galvan complains that, in responding to his counsel's foregoing statements to the jury, the prosecutor trivialized and diluted the reasonable doubt standard, and thereby engaged in misconduct by telling the jury that "[t]here's nothing" in the CALCRIM No. 220 instruction on reasonable doubt given by the court "about you can't wake up in a week and change your mind or that it has to be concerned about how you view your relationships or your children." Galvan also complains about the prosecutor's statements to the jury that "[you] get to decide what is beyond a reasonable doubt" and "that it was the jury's choice."

To preserve a claim of prosecutorial misconduct for appeal, a defendant must object in a timely fashion on that ground and request a curative jury admonition unless an admonition would not have cured the harm caused by the misconduct. (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *Nguyen, supra*, 40 Cal.App.4th at p. 36 ["If the defendant fails to object to the asserted misconduct and does not request an instruction or admonition to lessen any possible prejudice, then the asserted objection is thereby

11

waived."].) Here, by not objecting to the prosecutor's allegedly improper rebuttal arguments and not requesting a curative jury admonition, Galvan forfeited his claim of prosecutorial misconduct. (*Hinton*, at p. 863; *Nguyen*, at p. 36.)

Even if Galvan's claim of prosecutorial misconduct had been preserved, it would fail. "[I]t is misconduct [for a prosecutor] to misstate the law during argument." (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21.) "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).) Furthermore, when a claim of prosecutorial misconduct focuses on the prosecutor's questions or comments before the jury, "'the question is whether there is a *reasonable likelihood* that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203, italics added, quoting *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 822-823.)

Here, even if we were to assume the prosecutor misstated in some manner the law regarding the definition of proof beyond a reasonable doubt during her rebuttal argument, Galvan has not shown, and cannot demonstrate, that any assumed misstatement of the law by the prosecutor "infect[ed] the trial with such unfairness as to make [his] conviction[s] a denial of due process." (*Morales, supra*, 25 Cal.4th at p. 44.) As noted, the court properly instructed the jury under CALCRIM No. 220 on the beyond-a-reasonable-doubt standard of proof. During her closing argument, the prosecutor reminded the jury of their duty to "apply the law" set forth in the court's instructions and

12

specifically told them to "always go back to the jury instructions."  During his closing argument, defense counsel also reminded the jury of their duty to follow the law, including the court's instruction on reasonable doubt.  During her rebuttal argument, the prosecutor again directed the attention of the jury back to the court's instruction on the meaning of reasonable doubt.  Displaying the instructional language from CALCRIM No. 220 during her Power Point presentation and reading from CALCRIM No. 220, she told the jury, "This is the definition you're going to get.  And what I highlighted—it's the entire thing, but ['p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction the charge is true.[']  That's your definition."

We presume the jury in this case understood and followed the instruction on reasonable doubt that the court gave to the jury under CALCRIM No. 220.  (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9; *People v. Hinton, supra*, 37 Cal.4th at p. 871; *Nguyen, supra*, 40 Cal.App.4th at p. 37.)  Accordingly, because we presume the jury followed the court's instructions and nothing in the record shows otherwise, we conclude that the jurors ignored any misstatements the prosecutor made during her rebuttal argument, followed the court's instructions, and applied the proper standard set forth in CALCRIM No. 220 in deciding whether the People had met their burden of proof.  Galvan has not shown it is reasonably likely the jury construed or applied the prosecutor's complained-of remarks in an objectionable fashion.  (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1202-1203.)

Had Galvan's claim of prosecutorial misconduct been preserved, it would also fail under state law because, as the Attorney General correctly argues, "there was nothing

objectionable or deceitful or reprehensible about the prosecutor's argument." (*Morales, supra,* 25 Cal.4th at p. 44 ["Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."].)

Galvan's reliance on this court's decision in *Nguyen, supra,* 40 Cal.App.4th 28, is misplaced. Galvan asserts that, in *Nguyen,* this court "*reversed* where the prosecutor had argued that the reasonable doubt standard was 'a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving.'" (Italics added.)

Galvan misrepresents this court's decision in *Nguyen.* In that case, the prosecutor did tell the jury during closing argument that the reasonable doubt standard is "'a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving.'" (*Nguyen, supra,* 40 Cal.App.4th at p. 35.) The defendant claimed on appeal that his burglary conviction should be reversed because the prosecutor committed misconduct by misstating the reasonable doubt standard. (*Ibid.*) Concluding that the defendant "ha[d] a valid point," this court stated that "[w]e strongly disapprove of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry." (*Id.* at p. 36.)

However, this court did *not* reverse the defendant's conviction, as Galvan asserts. We *affirmed* the judgment, notwithstanding the prosecutor's misstatement of the law regarding reasonable doubt, because (1) the defendant had forfeited his claim of prosecutorial misconduct by failing to object in the trial court to the prosecutor's misstatement of the law; and (2) even if the claim had been preserved, the defendant "was not prejudiced since the prosecutor did direct the jury to read the reasonable doubt instruction," the jury was correctly instructed on the reasonable doubt standard, and we presumed the jury followed that instruction. (*Nguyen, supra,* 40 Cal.App.4th at pp. 36-37.)

Thus, Galvan's reliance on *Nguyen* is unavailing because he, like the defendant in that case, forfeited his claim of prosecutorial misconduct, and, like the *Nguyen* defendant, he suffered no prejudice because the jury was correctly instructed on the reasonable doubt standard, both the prosecutor and Galvan's counsel directed the jury to follow the reasonable doubt instruction, and there is nothing in the record to rebut the presumption that the jury followed that instruction.

Galvan's related claim of ineffective assistance of counsel also fails. In *Nguyen,* the defendant similarly claimed his conviction should be reversed because his trial counsel rendered ineffective assistance by failing to object to the prosecutor's misconduct in misstating during closing argument the law regarding the beyond-a-reasonable-doubt standard of proof. (*Nguyen, supra,* 40 Cal.App.4th at p. 37, fn. 2.) In rejecting that claim, we stated: "Having concluded the prosecutor's misconduct constituted harmless

error, we need not address Nguyen's argument his counsel's failure to object constituted ineffective assistance of counsel; any failure by counsel was likewise harmless." (*Ibid.*)

Here, we have concluded that, even if Galvan's claim of prosecutorial misconduct had been preserved, the claimed misconduct committed by the prosecutor during her rebuttal argument constituted harmless error.

Accordingly, Galvan's claim of ineffective assistance of counsel fails because "any failure by counsel was likewise harmless." (*Nguyen*, *supra*, 40 Cal.App.4th at p. 37, fn. 2.) In this regard, we note that the evidence of Galvan's guilt was overwhelming. The victim's testimony at trial was detailed and compelling. The victim's sister testified to the victim's distraught demeanor when the sister returned home after Galvan raped the victim and left. Forensic evidence and expert testimony established that Galvan's DNA was found in the dried secretion swabbed from the victim's thigh. In addition, the evidence showed the police recovered the victim's stolen gold bracelets and the missing DVD's during a search of Galvan's trailer.

For all of the foregoing reasons, we conclude Galvan's claim that his counsel rendered prejudicial ineffective assistance of counsel is meritless.

## II. *CONSECUTIVE SENTENCES* (*COUNTS 1-3*)

Galvan next contends the consecutive sentences imposed for his convictions of count 1 (forcible penetration with a foreign object), count 2 (forcible oral copulation), and count 3 (forcible rape) should be reversed, and the matter remanded for resentencing because the court applied section 654 instead of section 667.6(d) in deciding whether to

16

impose concurrent or consecutive terms for those sex-offense convictions. This contention is unavailing.

A. *Background*

At the sentencing hearing, defense counsel argued that even though the sex offenses "were charged separately and are separate convictions," for purposes of section 654 they were "very intertwined with one another and constitute[d] a singular course of conduct." He indicated the court should apply section 654 to two of the three sexual assault counts.

The prosecutor responded that section 654 did not apply because the charges were "separate and distinct" in that the penetration, the oral copulation, and the rape "were each happening at different time periods when this entire heinous event was occurring." She argued that it would be "completely unjustified" to "just allow the defendant to get some kind of an easier sentence because he decided to commit all of these acts in the same horrendous night."

The court then stated that it had reviewed section 667.6(d) and found that it "shed some light" on this issue:

> "In researching that issue, which I think is the crux of the whole sentencing, not only did I review the Rules of Court on this issue, but [*section*] 667.6, [*subdivisions*] (*c*) *and* (*d*) *also seem to shed some light on this*." (Italics added.)

Immediately thereafter, the court read into the record the first two paragraphs of section 667.6(d):

> "A full, separate, and *consecutive* term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes

17

involve separate victims or involve the *same victim on separate occasions*.

"In determining whether crimes against a single victim were committed on *separate occasions* under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a *reasonable opportunity to reflect upon his or her actions* and nevertheless resumed sexually assaultive behavior. *Neither the duration of time between crimes*, nor whether or not the defendant lost or abandoned his or her opportunity to attack, *shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions*." (Italics added.)

The court and the attorneys discussed the sequence of the commission of the sex offenses. Defense counsel argued that "the digital penetration occurred [at] approximately the time of the oral copulation." The prosecutor asserted that Galvan "orally [copulated the victim] first. And then he digitally penetrated her, and she said that hurt, so he stopped doing that, and then he tried to insert his penis in her vagina."

Referring to the "Penal Code that the Court just cited" (§ 667.6(d)), Galvan's attorney stated: "My interpretation of that would be, again, giving the defendant an *opportunity to form the ability to reflect upon his actions and then change his course of conduct*." (Italics added.)

Applying section 667.6(d), defense counsel then argued that Galvan committed all three sex offenses with "no opportunity to reflect." Specifically, defense counsel stated:

"I would argue here that we have a stream of conduct beginning with the act of oral copulation and/or digital penetration, and then going to the rape and then the ejaculation.

"That, again, went from one thing to another. The location did not change and only minutely . . . within the actual room did any of this location change. [¶] . . .

18

"I think the acts themselves went from one thing to another *without any opportunity for any sort of* pause or *reflection*. It was from the time of the starting of any of the acts until the ejaculation, from that time period there was no pause, *there was no opportunity to reflect*, and so it should be a singular course of conduct." (Italics added.)

The court again referred to section 667.6(d) by indicating "the code" does not require a break between crimes, and it states that time is not a determinative factor:

"I don't think the code requires a break, like a long break in the action, in fact, it says the time is not really a determinative factor."

The prosecutor agreed with the court's comments and also referred indirectly to section 667.6(d) by referring to "time to reflect":

"[T]hat would be my argument. . . . [T]hey need to have some *time to reflect*. [T]here is no set limit. It could be a second, it could be 30 seconds, it could be a minute, it could be an hour, that is not something that is laid out for by the law. It is just some period of time, whatever that looks like to be able to *reflect*." (Italics added.)

Immediately thereafter, the prosecutor argued that the facts in this case shows that Galvan had time to reflect on whether he should continue sexually assaulting the victim:

"[G]iven the fact how long this situation was going on and the fact that our victim the entire time is telling him, no, don't do this, and he is covering her mouth and he is moving from one thing to another. *He had an ample amount of time* in between pulling his pants down or pulling her shirt off or moving his face from her vagina to stick his fingers in her vagina *to reflect on whether or not this is a good idea to continue*." (Italics added.)

The prosecutor then referred to section 654, rather than section 667.6(d), and argued the events she had just mentioned were "separate and distinct":

"Those are each separate and distinct events, [section] 654 should not apply."

19

The court then asked defense counsel, "[W]ould you agree at least factually speaking that all three of these events were separate from one another? In other words, the oral copulation and the digital penetration did not occur at exactly the same time?" Counsel stated he believed they "flowed from one to the other."

After further discussion, the court stated: "My recollection is that they were separate, that he just went from one distinct act to another."

The court noted that although the victim "continually plead[ed]" with Galvan to stop, he continued to sexually assault her:

> "And I guess the biggest problem for Mr. Galvan is that while this is all occurring, you have the victim *continually pleading for him to stop*, and when something doesn't work, he is just moving on to something else." (Italics added.)

The court brought the discussion back to the question of whether Galvan had "time to reasonably assess his behavior," noting again that the victim was continually pleading with him to stop and pulling away from him and also noting that Galvan repeatedly threatened the victim and her sister's children during the span of about half an hour:

> "[I]t seems to me that given his statements, given the things he said to the victim and the way he went about terrorizing her that *there was time to reasonably assess his behavior*. [¶] It takes time, [he has] to stop what he was doing and start doing something else. *The whole time she is telling him, pleading to the defendant not to hurt her, pulling away from him, struggling*, so *that too requires some thought* to maintain the person where you want them so you could do these things to them. *Continually to threaten her, threaten to hurt the kids if she doesn't cooperate*, I mean this all, I agree with you is happening within the span of I think a half an hour." (Italics added.)

After finding that Galvan had time to reasonably assess his behavior, however, the court mentioned section 654:

> "I don't know how I find that it is [section] 654. To me it all sounds like separate and distinct acts all close in time."

Finally, the court found that the prosecutor's argument was "accurate" and legally correct and then ruled it would impose consecutive sentences for Galvan's sex-offense convictions.

### B. *Pertinent Statutes*

#### 1. *Section 654*

Section 654[3] "precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) If a defendant suffers two convictions and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed." (*Deloza,* at pp. 591-592.)

#### 2. *Section 667.6(d)*

Section 667.6(d) provides that a "full, separate, and *consecutive* term shall be imposed" (italics added) for each conviction of an enumerated sex offense "if the crimes involve separate victims or involve the *same victim on separate occasions*." (*Ibid.,* italics added.) Section 667.6(d) "constitutes a mandatory consecutive sentencing scheme

---

3      Section 654, subdivision (a) provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

21

applicable only when a defendant has been convicted of two or more [enumerated sex offenses]."  (*People v. Jones* (1988) 46 Cal.3d 585, 595 (*Jones*).)

In determining whether the crimes against a single victim were committed on separate occasions, the court must decide whether the defendant had "a *reasonable opportunity to reflect upon his or her actions*" (§ 667.6(d), italics added) between the commission of one sex crime and another, but "nevertheless resumed [his] sexually assaultive behavior."  (*Ibid*.)  "Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."  (*Ibid*.)

C.  *Analysis*

Acknowledging that his trial counsel may have "misled" the court by making a "section 654 argument," Galvan claims the court committed sentencing error in imposing consecutive sentences for his convictions of counts 1 through 3 because the court "applied a section 654 standard instead of the correct standard contained in [section 667.6(d)] in deciding whether to impose concurrent or consecutive life sentences."  In support of this claim, Galvan asserts that "[t]he court ruled that section 654 did not apply to the oral copulation, penetration, and rape counts because the crimes were 'separate and distinct.'"  He argues that "the decision to apply concurrent or consecutive sentences" under section 667.6(d) "does not entail an analysis whether the acts were 'separate and distinct,' but whether the defendant had a 'reasonable opportunity to reflect' between the acts."

22

We conclude Galvan's claim that the court committed sentencing error by applying section 654 instead of section 667.6(d) in deciding whether to impose concurrent or consecutive terms for his three sex-offense convictions is unavailing because his claim is not supported by the record of the sentencing hearing. We agree that Galvan's defense counsel misled the court by claiming at the commencement of the hearing that section 654 was "applicable" because, although the three sex offenses "were charged separately and are separate convictions," they were "very intertwined with one another and constitute[d] a singular course of conduct." Instead of objecting, the prosecutor compounded the problem by later arguing that "[section] 654 should not apply" because the offenses were "each separate and distinct events."

However, as the Attorney General correctly argues on appeal, a fair reading of the reporter's transcript of the sentencing hearing shows the court properly considered and applied the mandate in section 667.6(d) requiring consecutive sentencing for forcible sex crimes where the evidence shows that, "between the commission of one sex crime and another, the defendant had a *reasonable opportunity to reflect upon his . . . actions* and nevertheless resumed sexually assaultive behavior" (§ 667.6(d), italics added). Specifically, as discussed more fully, *ante*, the court told the attorneys that it had reviewed section 667.6(d) and found that it "shed some light" on this issue. The court then read into the record the first two paragraphs of section 667.6(d). Soon thereafter, during a discussion of the sequence of Galvan's sex offenses, defense counsel referred to the "Penal Code that the Court just cited"─a clear reference to section 667.6(d))─and

23

argued that Galvan committed the acts "without any opportunity for any sort of pause or *reflection*." (Italics added.)

The court then again referred, indirectly, to section 667.6(d) by stating that "the code" does not require a break between crimes, and "it says the time is not really a determinative factor." (§ 667.6(d) ["Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."].)

Continuing the discussion about whether Galvan should receive consecutive sentences for his sex crimes under section 667.6(d), the prosecutor stated she agreed with the court's comments, and she referred indirectly to section 667.6(d) by referring to "time to reflect." Almost immediately thereafter, she argued the facts in this case showed Galvan "had an ample amount of time in between pulling his pants down or pulling her shirt off or moving his face from her vagina to stick his fingers in her vagina *to reflect on whether or not this is a good idea to continue*." (Italics added.)

After further discussion, the court found that Galvan had "time to reasonably assess his behavior" and ruled it would impose consecutive sentences for Galvan sex offense convictions.

We conclude that, although defense counsel and the prosecutor took turns engaging in a distracting discussion about whether section 654 applied, the record establishes the court did consider and apply section 667.6(d). Galvan's claim that the court failed to do so is without merit.

### III. *SUFFICIENCY OF THE EVIDENCE* (*COUNTS 1 & 2*)

Last, Galvan contends that, if this court concludes the trial court applied the correct standard in imposing the consecutive sentences for his sex-offense convictions (counts 1-3), the consecutive sentences imposed in counts 1 and count 2 under section 667.6(d) should be reversed—and the matter should be remanded for a determination of whether concurrent sentences should be imposed as to those counts under section 667.6, subdivision (c)—because there is insufficient evidence to support a finding that Galvan had a "reasonable opportunity to reflect" between the forcible oral copulation of the victim (count 2) and the forcible penetration of her vagina with a foreign object (count 1) within the meaning of section 667.6(d). We reject this contention.

A. *Applicable Legal Principles*

As discussed, *ante*, section 667.6(d) "mandates full, separate, and consecutive sentences for certain sex offenses 'if the crimes . . . involve the *same victim on separate occasions*.'" (*People v. Jones* (2001) 25 Cal.4th 98, 104, quoting § 667.6(d), italics added.) In determining whether enumerated crimes against a single victim were committed on "separate occasions" within the meaning of section 667.6(d), a trial court must decide whether the defendant had "a *reasonable opportunity to reflect upon his or her actions*" (§ 667.6(d), italics added) between the commission of one sex crime and another, but "nevertheless resumed [his] sexually assaultive behavior." (*Ibid*.)

The courts in California have clarified that a trial court properly may find a defendant committed enumerated sex offenses against a single victim on "separate occasions"—*during the same assaultive encounter*—within the meaning of section

25

667.6(d) if the evidence supports a finding that the defendant had a reasonable opportunity to reflect upon his actions and nevertheless resumed his sexually assaultive behavior. The California Supreme Court has explained that, "[u]nder the broad standard established by [section 667.6(d)], the Courts of Appeal have not required a break of any specific duration or any change in physical location" for a finding that sexual assaults occurring during a continuous encounter with a victim constituted separate occasions. (*People v. Jones*, *supra*, 25 Cal.4th at p. 104.)

Thus, for example, as our Supreme Court has recognized, *People v. Irvin* (1995) 43 Cal.App.4th 1063, 1070 stands for the principle that a finding of "separate occasions . . . does not require a change in location or an obvious break in the perpetrator's behavior." (*People v. Jones*, *supra*, 25 Cal.4th at p. 104.) Similarly, *People v. Plaza* (1995) 41 Cal.App.4th 377 concluded that five sex offenses—three counts of forcible oral copulation, one count of rape, and one count of forcible vaginal penetration with a foreign object—that all occurred during the same assaultive encounter in the victim's apartment, with no break in the defendant's control over the victim, were all "separate occasions" for the purposes of section 667.6(d). (*Plaza*, at pp. 381, 385.)

Each case depends on unique facts, and in some cases courts have concluded the evidence did not support a finding that the defendant had a reasonable opportunity to reflect between sex acts committed in quick succession. (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1316; *People v. Corona* (1988) 206 Cal.App.3d 13, 18.)

B. *Analysis*

As pertinent here, the record shows that in sentencing Galvan to consecutive prison terms for his convictions of counts 1 and 2, the court found under section 667.6(d) that Galvan had a reasonable opportunity to reflect upon his actions between his commission of the forcible oral copulation (count 2) and his commission of the forcible penetration of the victim's vagina with a foreign object (count 1). We conclude the evidence is sufficient to support the court's finding.

As the Attorney General correctly points out, the record shows that before Galvan committed these two forcible sex crimes, he told the victim he had a knife and repeatedly threatened to kill her and her sister's two children if the victim screamed or did anything. The victim testified that she continued to resist and fight him despite his threats.

The victim also testified that when Galvan took off her pants and underwear, he started licking her private part between her legs. She stated that while he was licking her, she "just kept trying to push him away with [her] hands." When the prosecutor asked her how many times she tried to push his head away, the victim replied, "It was *all the time*." (Italics added.)

The victim testified that Galvan then put his finger in her private part as she *continued* to resist by trying to push him away.

The foregoing evidence shows the victim did not passively submit to Galvan's sexually assaultive acts after he repeatedly threatened her; rather, she actively resisted those acts by continuously trying to push him away. We are persuaded that the victim's active, continuous, physical resistance provided Galvan a reasonable opportunity to

27

reflect upon his actions and stop his sexually assaultive behavior after he completed his forcible act of oral copulation. The evidence establishes that despite this opportunity, Galvan chose to resume his sexually assaultive behavior by physically overcoming the victim's continuing resistance, repositioning his body, and committing the second offense of forcibly penetrating the victim's vagina with his finger. As already discussed, a finding of "separate occasions" within the meaning of section 667.6(d) does not require proof of a change of location or an obvious break in a perpetrator's behavior. (*People v. Jones*, *supra*, 25 Cal.4th at p. 104.) Thus, the fact that Galvan committed the two forcible sex offenses during the same assaultive encounter, at the same location, and without an obvious or protracted temporal break in his behavior is of no moment. The evidence supports the court's finding that the two sex offenses were committed on separate occasions for the purposes of section 667.6(d). For the foregoing reasons, we reject Galvan's claim that "there was insufficient evidence of an opportunity to reflect between the oral copulation and the penetration to support a consecutive terms [*sic*] under section 667.6[(d).]"

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

28